569 A.2d 929

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Josoph HENRY, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 26, 1989.

Decided Feb. 8, 1990.

J. Michael Farrell, Philadelphia, for appellant.

Donald B. Corriere, Dist. Atty., Richard H. Pepper, Bethlehem, Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On April 25, 1987, in the Court of Common Pleas of Northampton County, the appellant, Josoph Henry, was found guilty of murder of the first degree, rape, involuntary deviate sexual intercourse, indecent assault, burglary, theft, robbery, and aggravated assault. In connection with the murder conviction, a separate sentencing hearing was held, as required by 42 Pa.C.S. § 9711, and appellant was sentenced to death. The present appeal ensued. We find no error in the proceedings, and affirm the judgment of sentence.

The incident from which the convictions arose was one in which appellant burglarized the dormitory room of Jeanne Ann Clery, a student at Lehigh University. Clery, who was present at the time of the burglary, was viciously assaulted by appellant. He slashed Clery's neck repeatedly with broken glass, bit her face, raped her, sodomized her, strangled her, and beat her all over her face and body. Before leaving the scene, appellant murdered Clery to prevent her from identifying him.

## I. PRETRIAL

First, appellant claims that it was error for the trial court to deny his motion to bar selection of a petit jury from Lancaster County because of alleged systematic exclusions

of non-whites and those convicted of juvenile offenses and misdemeanors.[1] In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court held that in order to establish a prima facie violation of the Sixth and Fourteenth Amendment requirement that the jury represent a fair cross section of the community, the defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.

The record indicates that approximately 6,000 names are selected annually in Lancaster County to receive questionnaires concerning the recipients' availability for jury duty. The names are selected at random by computer and are taken from voter registration lists and from school census data. Approximately two percent of Lancaster County is black. In 1986, school census data, which lists all persons over eighteen living within the school district, was not used for the city of Lancaster, where 80% of the county's black population resides, because the computer tapes used by the city were not compatible with the county's computers. The names of prospective jurors from the city were generated by using voter registration lists.

The first prong of appellant's argument is that jury panels selected from voter registration lists systematically exclude blacks because blacks, so it is claimed, do not register to vote in proportion to their numbers.

This Court has repeatedly held that a criminal defendant may not attack the racial composition of jury panels drawn from voter registration lists on the theory that blacks are underrepresented in voter lists. *Commonwealth v. Terry,*

---

**1.** Although the trial was conducted in Northampton County, the jury was selected in Lancaster County, pursuant to a change of venire.

513 Pa. 381, 405–06, 521 A.2d 398 (1987), cert. denied, 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987); *Commonwealth v. Edwards*, 493 Pa. 281, 426 A.2d 550 (1981). Since the record indicates that the panels were formed by computer generated lists without regard to race, and since voter registration lists have been established as an acceptable source of such lists, there is nothing of record to indicate that the panels were improperly formed with respect to the race of prospective jurors, and appellant's assertion of error is without merit.

The second prong of appellant's claim is that it was error to exclude those convicted of juvenile and minor crimes from jury service. Although such persons do appear to have been excluded from jury service based upon their responses to questionnaires asking them whether they had ever been convicted of a crime, appellant is entitled to no relief on this claim since there is nothing of record to indicate that such persons are entitled to the protection afforded by *Duren v. Missouri*. As to the allegation that the jury was selected in violation of state law,[2] where the panel has been selected impartially, but the selection process erroneously excluded those convicted of lesser crimes, appellant is entitled to no relief absent a showing of prejudice resulting from the erroneous exclusion. Since no prejudice has been alleged, let alone proved, appellant is entitled to no relief on this claim.

Next, appellant argues that it was error for the trial court to have denied his pretrial motion in limine to preclude

**2.** 42 Pa.C.S. § 4502 provides:

Every citizen of this Commonwealth who is of the required minimum age for voting for State or local officials and who resides in the county shall be qualified to serve as a juror therein unless such citizen:

(1) is unable to read, write, speak and understand the English language;

(2) is incapable, by reason of mental or physical infirmity, to render efficient jury service; or

(3) has been convicted of a crime punishable by imprisonment for more than one year and has not been granted a pardon or amnesty therefor.

the Commonwealth from making reference to bite mark evidence through the testimony of Dr. Dennis Asen, a general practicing dentist. Dr. Asen testified as to the source and nature of bite marks found on the victim's body. Because the appellant did not dispute that he caused the marks, this claim actually concerns the dentist's testimony that the bite marks were attacking or sadistic in nature.

Appellant claims that the dentist is unqualified to state that the bite marks were attacking or sadistic because there is no generally accepted scientific procedure for comparing bite marks. Although it is true that the American Dentistry Association does not recognize forensic odontology as a specialty, and there is no board certification in forensic odontology, Dr. Asen testified that he had taken courses, attended lectures and read the professional literature concerning forensic odontology. Further, he testified that he had done research into the categorization of human bite marks and that he was able to distinguish lunatic and fighting bite marks from attacking or sadistic bite marks and from sexually oriented bite marks. The essence of the distinction is that fighting bite marks are less well defined because they are done carelessly and quickly, whereas attacking or sadistic bite marks are made slowly and produce a clearer pattern. According to Dr. Asen, the sadistic bite mark is one of the most well-defined. Sexual bite marks are also well defined, but usually have a red center, produced by sucking tissue into the mouth. The dentist testified that the bite marks produced in this case were extremely well-defined, and were attacking or sadistic in nature. The legal significance of this testimony is that it might have been considered by the jury as part of their determination that the homicide was committed by means of torture.

Pennsylvania has adopted a liberal standard for the qualification of an expert. "Generally, 'if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the jury.'" *Com-*

*monwealth v. Gonzalez,* 519 Pa. 116, 128, 546 A.2d 26 (1988), quoting *Kuisis v. Baldwin–Lima–Hamilton Corp.,* 457 Pa. 321, 338, 319 A.2d 914, 924 (1974); *Moodie v. Westinghouse Electric Corp.,* 367 Pa. 493, 501, 80 A.2d 734, 738 (1951). In this case it was established that Dr. Asen had a specialized knowledge in the area of identifying bite marks, and the trial court was careful to instruct the jury that they were free to accept or reject his testimony:

> [A]s I have stated, the fact that I am permitting this witness to opine in this area does not in any way mean that you are going to find his opinions reliable or worthy of belief. You will have to make that decision. On the other hand, it doesn't mean you won't. What I'm trying to tell you is don't attach any significance that by my permitting it that you are obligated to follow it. You will get a whole set of instructions that deals with how a jury approaches testimony given by expert witnesses. And the bottom line of those instructions will be that if the jury finds in a given case that the expert's opinion is not worthy of belief, the jury has the full right, under the law, to reject it.

Since Dr. Asen was established as a practicing dentist who had specialized knowledge of bite mark identification, and since the jury was clearly informed of its right to accept or reject Dr. Asen's testimony, it was not error to have denied appellant's motion in limine to exclude the testimony of Dr. Asen.[3]

## II. TRIAL

▮▮▮▮ The primary trial phase issues concern the verdicts of insanity and "guilty but mentally ill." Appellant claims that the trial court erred in taking these two issues

---

**3.** The opinion of the trial court adequately deals with the following arguments of appellant alleging pretrial errors, inasmuch as we have previously addressed these subject areas, and the trial court properly applied our decisions: (1) the death penalty statute is unconstitutional; (2) the appellant was brought to trial in violation of Rule 1100; (3) the trial court erred in not inquiring as to the racial bias of a prospective juror; and (4) it was error to admit into evidence the appellant's statement to Marvin Brunson.

away from the jury as a matter of law. He also challenges evidentiary rulings permitting or prohibiting proof of facts relating to the issues of insanity and guilty but mentally ill.

Appellant's main contention is that the trial court erred in granting the Commonwealth's demurrer to the sufficiency of the evidence as it related to the defense of insanity. Appellant argues that the court's conclusion that Pennsylvania does not recognize a defense of insanity based upon what is described as an inherent pathologic illness triggered by the voluntary ingestion of alcohol is a perversion of 18 Pa.C.S. § 308 [4] and a misinterpretation of appellate cases addressing the issue of alcohol in relation to the defense of insanity. He argues that in enacting section 308, the legislature did not intend that the insanity defense and guilty but mentally ill verdict be taken away from a defendant when a *M'Naghten* state results from alcohol triggering an inherent pathological psychiatric illness, such as "alcohol idiosyncratic intoxication."

We hold, however, that the trial court properly interpreted and applied the law. In *Commonwealth v. Hicks*, 483 Pa. 305, 396 A.2d 1183 (1979), this Court rejected the defendant's insanity defense based on the theory that his behavior resulted from a passive pathological condition triggered by the ingestion of alcohol. The Court stated that "an actor should not be insulated from criminal liability for acts which result from a mental state that is voluntarily self-induced." *Id.*, 483 Pa. at 311, 396 A.2d at 1186. The Superior Court followed *Hicks* in *Commonwealth v. Plank*, 329 Pa.Super. 446, 451–52, 478 A.2d 872, 875 (1984), where it upheld the exclusion of expert psychiatric testimony that the defendant suffered from a mental disorder manifested in blackouts triggered by alcohol. The court ruled that the

**4.** 18 Pa.C.S. § 308 provides:

Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

testimony was irrelevant as a matter of law, then stated: "Appellant took the alcohol by his own hand. If he drank voluntarily, the insanity defense is barred because appellant induced the infirmity." Similarly, in *Commonwealth v. Kuhn*, 327 Pa.Super. 72, 82, 475 A.2d 103, 108 (1984), the Superior Court concluded that "involuntary intoxication cannot, as a matter of law, be established through evidence. showing that the criminal defendant was a chronic alcoholic incapable of voluntarily refraining from ingestion of alcohol."

Thus, the law has developed in Pennsylvania that a defendant cannot, as a matter of law, be insulated from criminal liability for his actions by claiming a mental state resulting from alcohol which was voluntarily ingested. Whether or not appellant was aware that he would suffer from the mental state is irrelevant, the fact that he voluntarily ingested the alcohol being determinative in depriving him of an insanity defense.

The same reasoning precludes a verdict of guilty but mentally ill. Where a defendant cannot as a matter of law present an insanity defense, he is also prohibited from any other application of that testimony to make out a mental infirmity sufficient to support a guilty but mentally ill verdict. The guilty but mentally ill verdict is available only if a defendant's proferred insanity defense does not reach the necessary *M'Naghten* standard. 18 Pa.C.S. § 314(a).[5] Since appellant's insanity evidence was irrelevant as a matter of law in this case because his mental state was triggered by his voluntary ingestion of alcohol, he cannot use that same evidence to establish a mental infirmity resulting from the voluntary act of drinking.

---

**5.** 18 Pa.C.S. § 314(a) states:

　　**(a) General rule.**—A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

The appellant also challenges the trial court's denial of his attempts to introduce numerous items of evidence related to his defense of alcohol idiosyncratic intoxication. Specifically, he objects to the denial of a videotape of an alcohol-provoked EEG, appellant's family physician's records, appellant's high school and college records, appellant's father's medical records, the medical records of Robert and Wallace Bracy, and testimony from appellant's father and a psychiatrist regarding appellant's father's drinking history.

■ The trial court permitted appellant to introduce evidence of the amount of alcohol he drank the night before the murder, and permitted him to introduce evidence of his theory of alcohol idiosyncratic intoxication for the limited purpose of establishing that he lacked the specific intent necessary to commit murder of the first degree. Since the evidence of alcohol idiosyncratic intoxication was only relevant on the issue of specific intent, the trial court limited the psychiatric testimony to the diagnosis of appellant and did not permit testimony of specific instances of appellant's father's history which supported the psychiatrist's opinion that appellant inherited the condition from his father. The court specifically held that the only relevant inquiry into appellant's father's behavior was the extent to which his medical history was accurately reflected in the medical records relied upon by the psychiatrist in forming his diagnosis. These limitations on the testimony relating to appellant's father's history and behavior were proper limitations on the basis of relevancy.

■ Similarly, the denial of various records of appellant, including family medical records, high school and college records, and medical records of Robert and Wallace Bracy, was proper in that the materials were adequately covered in the testimony, and that introduction of the records would have served only to distract the jury from the relevant issues.

The videotape of the alcohol-provoked EEG sought to be introduced by appellant was denied because the conditions it depicted were too dissimilar to the appellant's physical and mental condition on the night of the crime. The law is clear that experimental evidence is admissible only if the conditions under which the experiment was conducted are substantially similar to those at the time of the event in question. *Commonwealth v. Sero,* 478 Pa. 440, 387 A.2d 63 (1978). The trial court concluded that the EEG did not in any respect simulate the conditions on the night of the murder, but instead depicted a deep subconscious state produced under laboratory-induced intoxication. The evidence of the crime suggests that the appellant was fully conscious of his criminal actions, to the extent that he carried out a detailed burglary plan and was able to formulate an intent to kill in order not to be identified. We therefore perceive no error in refusing to permit the jury to view the videotape of the EEG.

Finally, appellant claims that the verdict of guilty as to murder of the first degree is contrary to the weight of the evidence. Moreover, in *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we established that in each death penalty case this Court would determine whether there was sufficient evidence to sustain the conviction for murder of the first degree. In view of appellant's confessions to several fellow college students and to his cellmate, Brunson, we emphatically reject his attack on the weight of the evidence, and hold that there was sufficient evidence to sustain the conviction.[6]

6. Again, the opinion of the trial court satisfactorily disposes of the following arguments of appellant alleging trial error, inasmuch as we have previously addressed these subject areas, and the trial court properly applied our decisions: (1) the court erred in admitting into evidence inflammatory, prejudicial photographs; (2) the court erred in admitting the expert testimony of Dr. Asen as to bite-mark identification due to its unreliability and prejudicial nature; (3) the court erred in admitting the expert testimony of Dr. Mihalakis concerning the character of cuts on the victim's neck due to its unreliability and prejudicial nature; (4) the court erred in permitting the Commonwealth to conditionally rest and reserve their right to call Marvin

## III. DEATH SENTENCE

At the penalty phase of trial, the jury found that three aggravating circumstances were present. One of these was that the victim was killed to prevent her from giving testimony against appellant. This aggravating circumstance is set forth in 42 Pa.C.S. § 9711(d)(5), which provides:

> The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

■■■ Appellant contends that it was error for the trial court to submit consideration of this aggravating circumstance to the jury, in that the victim was not a witness in any *pending* criminal proceeding. We do not agree. In *Commonwealth v. Appel*, 517 Pa. 529, 537–38 n. 2, 539 A.2d 780, 784 n. 2 (1988), we held that this aggravating circumstance may be found in cases where there was not a *pending* criminal proceeding, provided that in such cases proof of the killer's intention to eliminate a potential witness is established by direct rather than circumstantial evidence. *Accord Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479, 485 (1989). Such was the case here.

Appellant confessed to a number of individuals that the murder was committed to keep the victim from identifying him. The victim awakened while her room was being burglarized, and appellant immediately decided to eliminate her as a witness to that crime. Kenneth Copeland, a friend of appellant, testified that appellant told him that the victim "had saw him, so he had to kill her, and he started beating her...." Another friend, George Bass, testified that appel-

---

Brunson as a witness; (5) the court erred in permitting the Commonwealth to call two Philadelphia detectives and a Pennsylvania state trooper for the sole purpose of collaterally bolstering the credibility of another Commonwealth witness; (6) the court erred in permitting the expert testimony of Mr. Alan Levitt, a psychologist; (7) the court erred in refusing to permit the defense to recall Dr. O'Brien, a psychiatrist, on rebuttal; and (8) appellant was denied a fair trial by the prosecutorial use of a four-minute time period simulation in the Commonwealth's summation.

lant said that while he was in the victim's room, "she woke up, and he attacked her and strangled her to keep her quiet." Stephen Rossi, another acquaintance, testified that appellant said he "made sure she was dead." And Marvin Brunson, one of appellant's cellmates in prison, testified that appellant said he committed the murder "to keep the girl from identifying him." Hence, proof of appellant's intention to eliminate the victim as a potential witness was established through direct evidence.

It is also argued that this aggravating circumstance should be held applicable only in cases where the intention to kill a witness was formed prior to commencement of the criminal episode that led to the killing. Appellant points out that in *Commonwealth v. Appel*, supra, the defendant planned to commit a bank robbery and concurrently planned to kill all of the eyewitnesses to the robbery. In contrast, while the present case involves a decision to kill for the purpose of eliminating a witness, the decision was not made until the underlying criminal episode had already begun. We perceive no basis, however, for making this aggravating circumstance dependent upon *when* the intention to kill a witness was formed. *See Commonwealth v. Strong*, supra. In 42 Pa.C.S. § 9711(d)(5), supra, there is no language indicating that the time of forming an intention to kill a witness is a matter of significance. The killing of witnesses constitutes a frontal assault upon the criminal justice system, *Commonwealth v. Appel*, 517 Pa. at 537–38 n. 2, 539 A.2d at 784 n. 2, and, whether the decision to kill is made at an early stage, or later, the assault upon the justice system is the same.

The final argument regarding this aggravating circumstance is that the jury should have been instructed on the necessity of finding, by direct evidence, that appellant committed the murder while having a fully formed intent to eliminate a potential witness. The record reveals, however, that the jury *was* instructed that this aggravating circumstance requires proof that the "victim was a prosecution witness to felonies committed by the defendant and was

killed *for the purpose of* preventing her testimony against the defendant in any criminal proceeding involving such offenses." (Emphasis added). This instruction was entirely proper, for it stated the necessary element of intent, and was in conformity with the language set forth in 42 Pa.C.S. § 9711(d)(5), supra. Further, in view of the direct evidence described supra, consisting of appellant's admissions to a number of individuals that the killing was committed to keep the victim from identifying him, there is no possibility that the jury's finding was based upon circumstantial rather than direct evidence.

■ The second aggravating circumstance found by the jury was that the murder was committed by means of torture, 42 Pa.C.S. § 9711(d)(8). It is alleged that there was insufficient evidence of torture adduced at trial, and, thus, that the trial court erred in allowing the jury to consider this as an aggravating factor. As stated in *Commonwealth v. Nelson*, 514 Pa. 262, 280, 523 A.2d 728, 737 (1987), cert. denied, 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987), this aggravating circumstance requires: "[A]n intent to cause pain and suffering in addition to the intent to kill. There must be an indication that the killer is not satisfied with the killing alone." *Accord Commonwealth v. Caldwell*, 516 Pa. 441, 448, 532 A.2d 813, 817 (1987). The present record provides ample support for finding that appellant tortured his victim. As heretofore described, the testimony established that appellant formed an intent to kill as soon as he was discovered in the act of burglarizing the victim's room. Prior to strangling the victim, however, appellant viciously beat, raped, and sodomized her, and repeatedly cut her neck with a piece of broken glass and bit her on the face. Bruises on numerous areas of the victim's body indicated that the beating had been extensive in scope. Appellant's intention to inflict pain and suffering beyond that associated with the killing itself was plainly demonstrated by the evidence.

■ The third aggravating circumstance found by the jury was that the murder occurred during the perpetration

of a felony, 42 Pa.C.S. § 9711(d)(6). This finding was clearly supported by the evidence, for the killing was committed in connection with burglary, robbery, rape, and involuntary deviate sexual intercourse. Thus, having reviewed all of the aggravating circumstances found by the jury, we find that all were supported by the evidence. *See* 42 Pa.C.S. § 9711(h)(3)(ii) (appellate duty to review findings as to aggravating circumstances).

The jury also found two mitigating circumstances, to wit, that the defendant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), and other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). The jury determined that these mitigating circumstances were outweighed by the aggravating circumstances, and, accordingly, imposed a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv).

 Appellant contends that, based upon the weight of the evidence, the following additional mitigating circumstances should have been found by the jury: 1) that the defendant was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2); 2) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, 42 Pa.C.S. § 9711(e)(3); and 3) that the age of the defendant at the time of the crime was a mitigating factor, 42 Pa.C.S. § 9711(e)(4). We have examined the record and find no basis for overturning the jury's determination that these mitigating circumstances were not established.

It is a fundamental rule that a jury may believe any, all, or none of a party's evidence. *Commonwealth v. Nelson,* 514 Pa. at 272, 523 A.2d at 733. A jury is not obliged, therefore, to believe expert medical or psychiatric testimony offered to prove that a defendant acted under diminished mental capacity. *Id.* The jury in the present case disbelieved expert testimony proffered by the defense, and instead, based on the testimony of appellant's acquaintances

regarding his behavior on the night of the crime, and his later admissions, concluded that appellant's mental state was not such as would qualify as a mitigating circumstance. Also, as to whether age was a mitigating factor, the evidence showed that appellant was twenty years of age at the time of the crime and that he was a student at Lehigh University. It clearly cannot be said that appellant was so young or immature that the jury erred in finding that age was not a mitigating factor.

 Appellant also claims that the trial court erred in excluding certain mitigating evidence. This evidence consisted of a videotape of an EEG neurological test showing appellant's reactions to ingestion of small amounts of alcohol, and opinion testimony of a professor and a director of prison religious activities indicating that, if appellant were to spend his life in prison, he might serve as an academic tutor or as a spiritual contributor to fellowship ministries. This evidence was properly excluded on grounds of relevancy. The EEG was conducted under laboratory conditions that bore no similarity to conditions present on the night of appellant's crime. It therefore provided no relevant insight regarding appellant's criminal behavior. Also, opinions of the professor and the director of religious activities would have been purely speculative as to the role which appellant might have played in prison, and would not have constituted evidence of appellant's character or record or the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). It should be noted that the professor and the religious activities director did, however, testify freely regarding appellant's character and record.

 Appellant further claims that the trial court erred in denying a defense request that the jury be permitted to read the medical records of appellant's father and uncles. Testimony regarding these records was introduced by the defense in the guilt and penalty phases of trial, in furtherance of a contention that appellant suffered from genetic psychiatric disorders. Allowing the jury to read the records, however, would have placed before the jury a

variety of additional data of an irrelevant nature, and on this basis the trial court properly refused the defense request.

 It is next alleged that the prosecutor's closing remarks in the penalty phase of trial contained improper remarks comparing appellant with Charles Manson and other mass murderers, as well as references to appellant's racist attitudes, and that these remarks denied appellant a fair trial on the issue of punishment. The remarks included the following:

> We have to put a stop to senseless killings. We have to defend our society, our way of life. We will not accept these kinds of explanations any more. Josoph Henry, you have stepped over the line. Enough is enough ...
>
> ... But I say to you that you must acknowledge that in our world, ever since history has been recorded, there have been people who do evil. There are people who are evil. The Bible speaks of the Prince of Darkness. The personification of evil. We have read of the contract killer, the killer for hire. The people responsible for the Holocaust, Charles Manson, and many, many others. These people are different from you and me.

The trial court sustained a defense objection to this language and issued a cautionary instruction to the jury.

The remarks in question were very closely patterned after, indeed, substantially excerpted from, remarks made by the prosecutor in *Commonwealth v. Whitney*, 511 Pa. 232, 242–49, 512 A.2d 1152, 1158–60 (1986). In *Whitney*, this Court held that the remarks were not so extreme as to have rendered the sentencing verdict a product of passion, prejudice, or other arbitrary factor. The remarks in *Whitney* were more extensive and inflammatory than the present ones, for in that case the prosecutor spoke at greater length of the need to defend society, and, in addition to discussing the Prince of Darkness, contract killers, and personifications of evil, invoked references to "General Achilles," Iago, Adolf Hitler, and a mass murderer of

babies. The prosecutor in *Whitney* also stated that the defendant was more barbaric than a wild animal.

This Court held that the remarks in *Whitney* were within the bounds of "oratorical flair" permitted in arguments at the sentencing stage, and that the remarks were a permissible response to defense counsel's argument that the defendant's purported inability to control his conduct constituted a mitigating circumstance.[7] In the present case, defense counsel made an identical argument. Under *Whitney*, the prosecutor's remarks in this case cannot be regarded as having tainted the sentencing verdict. We note, however, that the prosecutorial practice of pushing "oratorical flair" to its limits, and patterning arguments upon remarks that this Court has only narrowly tolerated, is a dangerous practice we strongly discourage.

■ One additional remark made during the prosecutor's closing argument has been challenged by appellant (a black man) as racially prejudicial. Referring to the victim, the prosecutor stated: "She was white, she was society, he [appellant] was going to punish Jeanne Ann Clery." A defense objection to this remark was overruled by the trial court on the ground that the remark was properly based upon the evidence regarding motive. Marvin Brunson, appellant's cellmate in prison, had testified as follows:

Q: What if anything did he tell you about his feelings about race?

A: He said he was prejudice [sic].

Q: What did he say?

A: He said, well, where he lived at that, you know, you might be lucky if you see one white person. And when he got to the college, he just started hating white people because he was around white people.

Based upon this testimony, the prosecutor's remark was not improper.

---

**7.** This writer authored a concurring and dissenting opinion in *Commonwealth v. Whitney,* supra, joined by Mr. Chief Justice Nix and Mr. Justice Zappala.

■ The remaining issues raised by appellant concerning the penalty. phase of trial are lacking in merit and warrant only brief discussion. It is alleged that the trial court erred in allowing the jury to view photographs of cuts and bruises on various parts of the victim's body. These were, however, probative of the vicious nature of the killing, and supported the prosecution's theory that the victim had been tortured. Their probative value outweighed any possible inflammatory effect. *See Commonwealth v. Buehl,* 510 Pa. 363, 391–93, 508 A.2d 1167, 1181–82 (1986), cert. denied, 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988). See also *Commonwealth v. McCutchen,* 499 Pa. 597, 454 A.2d 547 (1982).

■ In support of its contention that torture occurred, the prosecution introduced testimony from a forensic pathologist, Dr. Mihalakis, who had also testified during the guilt phase of trial. The testimony of Dr. Mihalakis during the penalty phase was that the multiple transverse cuts found on the front of the victim's neck were of a sort generally attributable to threatening and at-bay situations. Appellant alleges that this testimony constituted pure speculation, and that the trial court erred in allowing its admission. We do not agree. Dr. Mihalakis was properly qualified as a forensic pathologist, and he testified that his opinion regarding the source of these cuts was based upon his experience in reviewing multiple cases. Such an opinion was properly within his expertise to render.

■ Appellant next argues that he should have been permitted to address the jury at the sentencing phase of trial without being subjected to cross-examination. We recently considered and rejected this same argument. *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 211–13, 555 A.2d 846, 857–58 (1989).

■ It is also alleged that the jury instructions too narrowly defined the role of mercy as a sentencing consideration. Appellant concedes that, as the court instructed,

absolute mercy verdicts are precluded by the sentencing statute. *See Commonwealth v. Holcomb*, 508 Pa. 425, 472, 498 A.2d 833, 857 (1985) (Opinion Announcing the Judgment of the Court), cert. denied, 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986). The court further instructed, however, that jurors *are permitted* to be swayed by sympathy *but only* where the sympathy results from the *evidence.* Appellant claims that this instruction improperly restricted considerations of sympathy or mercy that might relate to appellant's character. The sentencing statute allows for consideration of a defendant's character, but contemplates that a jury's findings and emotional responses will relate to the *evidence.* Specifically, 42 Pa.C.S. § 9711(e)(8) provides that mitigating circumstances shall include "[a]ny other *evidence* of mitigation concerning the character and record of the defendant and the circumstances of his offense." (Emphasis added). The trial court's instruction was, therefore, proper.

 Appellant further claims that the trial court erred in refusing to instruct the jury that a sentence of life imprisonment means life imprisonment without an opportunity for parole. Such an instruction would have been misleading, and it would have introduced parole as a sentencing consideration. We have held that parole, pardon, and commutation of sentence are matters that should not enter in any manner into a jury's deliberations regarding the sentence to be imposed in a first degree murder case. *Commonwealth v. Strong*, 522 Pa. at 458–460, 563 A.2d at 485–86. The instruction was properly denied.

 Next, it is alleged that the trial court should have acceded to a defense request that the verdict slip be amended to offer the following "alternative" verdict: "We the jury are convinced we cannot agree that death is the appropriate penalty and, thus, defendant is sentenced to life imprisonment." This request was properly denied, for the

existing verdict slip was perfectly adequate. It clearly expressed that a sentence of death could be imposed only if the jurors unanimously agreed. Further, the court's instructions to the jury made it clear that, in the event of a failure to agree unanimously on a sentence of life or death, the jury should report that fact to the court and the court would impose a sentence of life imprisonment. Under these circumstances, it is inconceivable that the jurors failed to agree unanimously that death was an appropriate penalty. Further, a poll of the jury conducted after announcement of the verdict confirmed that all jurors agreed to the sentence imposed.

■ Appellant's final argument is that, upon consideration of the totality of circumstances pertaining to the sentencing proceeding, it should be concluded that he was denied a fair trial on the issue of punishment. We do not agree. None of the issues raised by appellant have cast valid doubt upon the fairness of the sentencing process, and the record provides no basis for belief that the sentence of death was the "product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i).[8]

■ Finally, in accordance with our duty to review sentences of death from the standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. at 62, 454 A.2d at 961, we have reviewed the sentence imposed upon appellant in light of sentencing data compiled and monitored by the Administrative Office of the Pennsylvania Courts. *See Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). We perceive no excess or disproportionality in the sentence imposed. Accordingly, the sentence must be

8. In reviewing imposition of a death sentence in this case it is of interest to note that, in discussing his feelings about having committed this murder, appellant stated to his cellmate Marvin Brunson: "It ain't nothing."

162

affirmed.[9]

Judgment of sentence affirmed.

McDERMOTT and PAPADAKOS, JJ., concur in the result.

---

**9.** The Prothonotary of the Eastern District is directed to transmit the complete record of this case to the Governor, 42 Pa.C.S. § 9711(i).